Hawaiian Freight Forwarders, Ltd. v. Commissioner.
Hawaiian Freight Forwarders, Ltd. v. Commissioner
Docket Nos. 9969, 111693.
United States Tax Court
1947 Tax Ct. Memo LEXIS 195; 6 T.C.M. (CCH) 601; T.C.M. (RIA) 47149; May 29, 1947
*195 Reasonable compensation for services of petitioner's officers determined. Louis Janin, Esq., 1120 Mills Tower, San Francisco, Calif., for the petitioner. W. J. McFarland, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined the following deficiencies in the petitioner's tax liabilities and imposed the penalty noted for the period from *196 April 1, 1940, to November 30, 1940, and for the fiscal year ending November 30, 1941: Period
Fiscal
Tax
in 1940
Year - 1941
Income
$2,971.13
$13,448.23
Declared value excess
profits
2,229.39
1,667.00
Excess profits
3,020.69
10,348.88
Penalty
755.17
The basic issue is whether or not certain sums accrued on the petitioner's books and payable to its two principal officers as bonuses, are deductible and, together with regular salaries, constituted reasonable compensation for the services of those officers. An alternative issue, arising only if the petitioner does not prevail on the major issue, is whether or not it is entitled to the benefit of Supplement A, as provided by sections 740 to 744, inclusive, of the Internal Revenue Code, for the purpose of computing an excess profits credit based on income. The respondent's imposition of a 25 per cent delinquency penalty for the failure to file a timely excess profits tax return for the taxable period from April 1, 1940, to November 30, 1940, inclusive, is also contested by the petitioner. Findings of Fact Certain facts were stipulated. The portions thereof material to the issues are as follows: *197 The petitioner is a corporation organized and operating in the Territory of Hawaii and has its principal office in Honolulu. It filed its income, declared value excess profits and defense tax returns with the collector of internal revenue for the District of Hawaii. Hawaiian Freight Association, Ltd. was organized as a corporation under the laws of the Territory of Hawaii on March 16, 1933, to engage in the freight forwarding business; it was liquidated and dissolved on or about December 31, 1936, and its assets distributed to its then shareholders who were J. C. Leffel, G. C. Ballentyne and A. G. Schnack, who owned 33 shares, 24 shares and 10 shares, respectively. On or about December 31, 1936, the shareholders created a partnership, Hawaiian Freight Association, and to it transferred the assets and business theretofore owned and operated by Hawaiian Freight Association, Ltd. The interests of the partners were in the same proportions as their shareholdings in the predecessor corporation, and so remained until March 8, 1940. Prior to March 8, 1940, an understanding had been reached between J. C. Leffel and G. C. Ballentyne and Oahu Railway and Land Company, hereinafter called *198 Oahu, that a corporation would be formed to take over and operate the assets and business of Hawaiian Freight Association, with Leffel, Ballentyne and Oahu as equal shareholders. It was believed that this would be to the mutual advantage of the parties concerned. On March 8, 1940, an agreement was entered into by and between Schnack, Leffel and Ballentyne with respect to Schnack's interest in Hawaiian Freight Association. Under that agreement Leffel and Ballentyne purchased from Schnack, who desired to withdraw from the partnership, his entire interest therein for $8,000 cash. The petitioner was organized as a corporation under the laws of the Territory of Hawaii, March 13, 1940, with a capital of $120,000, represented by 6,000 shares, issued 2,999 to Leffel and 2,998 to Ballentyne, 3 qualifying shares being nominally issued to others. For this stock there were transferred on March 31, 1940, to the petitioner the business and the following assets formerly owned by Hawaiian Freight Association (the partnership): Cash
$ 19,237.07
Receivables
9,151.08
Furniture and fixtures
1,341.86
Stationery
269.99
Good will
90,000.00
Total
$120,000.00
On July 12, 1940, the *199 following agreement was entered into by Leffel, Ballentyne and Oahu: "WHEREAS, the First Parties own stock in Hawaiian Freight Forwarders, Ltd., an Hawaiian corporation, as follows: G. C. Ballentyne 3000 shares of the par value of Twenty Dollars ($20.00) per share; J. C. Leffel 3000 shares of the par value of Twenty Dollars ($20.00) per share; their combined holdings constituting all of the issued and outstanding stock of said corporation; and "WHEREAS, it is the desire of the First Parties that the Second Party become interested in said corporation, and to that end the First Parties have offered to sell to said Second Party out of the stock owned and held by them, Two Thousand (2,000) shares of the capital stock of said corporation (1,000) shares each of the par value of Twenty Dollars ($20.00) for the sum of Fifteen Thousand Dollars ($15,000.00); and "WHEREAS, the First Parties have over the past several years become thoroughly conversant with the business engaged in and conducted by said Hawaiian Freight Forwarders, Ltd.; and "WHEREAS, it is recognized that said corporation is in effect a personal service corporation and that the success or failure of said corporation *200 depends on the rendition of satisfactory service by said First Parties, both of whom are officers and employees of said corporation, and that satisfactory salaries make for the rendition of satisfactory service; and "WHEREAS, it has been agreed between the parties hereto that said corporation shall not pay out of its net profits in any one year, a dividend in excess of the aggregate amount of Two Thousand Two Hundred Fifty Dollars ($2,250.00) on all of its outstanding stock until such time as said First Parties shall have been paid from net profits, each, the sum of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00), over and above the fixed annual salary hereinafter referred to, as additional salary by way of bonus for services rendered and to be rendered by them to said corporation, and thereafter, that is, after the full payment of said sum of $37,500.00 to each of said First Parties, and after the payment of an annual dividend of ten per cent (10%) on the par value of all outstanding stock, that said First Parties shall be paid an additional salary by way of bonus, annually, equal to twenty-five per cent (25%), that is, twelve and a half per cent (12 1/2%) each, of the remaining *201 net earnings, if any, of said corporation. "NOW, THEREFORE, in consideration of the premises, the First Parties hereby each agree to sell and deliver to said Second Party, One Thousand (1,000) shares (total of Two Thousand (2,000) shares), of the capital stock of the aforesaid corporation standing in his name on the books of said corporation, for the sum of Seven Thousand Five Hundred Dollars ($7,500.00), and said Second Party agrees to accept the same, and to pay therefor in cash upon delivery, to each of said First Parties, the sum of Seven Thousand Five Hundred Dollars ($7,500.00); and "FURTHER, the parties hereto mutually agree: "(a) That after the consummation of the sale aforesaid, they and each of them, will not sell any of the stock standing in their or any of their names on the books of the corporation, until the bonus aforesaid, in the amount of $37,500.00 payable to each of said First Parties, has been paid in full out of the net profits earned by said corporation, and that after payment of the aforesaid bonus, in case any one or more of them should desire to sell his stock in the corporation aforesaid, or in the event of the death of any one or more of the aforesaid *202 parties, it is agreed that the other parties hereto shall have the option to purchase and acquire the whole of the stock interest of such party so dying or so desiring to sell his stock, at the fair value thereof, which fair value shall be ascertained as follows: In case the parties can agree upon the price to be paid, then the party or parties desiring to purchase may do so at such price so agreed upon, but in case the representative of the party so dying or the party desiring to sell his stock, and the remaining parties to this contract, cannot agree upon the fair value thereof, then each of the parties shall have the right to appoint one experienced businessman as arbitrator, who, if they can agree shall fix the price, whereupon the remaining parties hereto shall have the right to purchase or refuse to purchase said stock of said party wishing to sell or dying at such figure. In the event that the two arbitrators appointed cannot agree, then they shall choose a third party as umpire, and the decision of the majority thereof shall fix a price at which the remaining parties hereto shall have the right to take or refuse the stock at the price so determined. In case the parties remaining *203 refuse to purchase at the price so determined, then the stock may be sold or retained by the owner or his representative at his discretion. "It is further agreed that if any party hereto shall sell his stock to one or both of the other parties hereto, said party so selling will not for the period of ten years from the date of the consummation of any such sale, either directly or indirectly or through the medium of a partnership or corporation, enter into any business in the Territory of Hawaii competing with the business conducted by said Hawaiian Freight Forwarders, Ltd.; "(b) That they will not, either as directors or stockholders, vote to declare a dividend out of the net earnings of said corporation, in excess of the sum of Two Thousand Two Hundred Fifty Dollars ($2,250.00) annually, until the aforesaid bonus of Thirty-seven Thousand Five Hundred Dollars ($37,500.00) payable to each of said First Parties, has been paid in full, and that thereafter, that is, after the payment of the said bonus, and after payment of an annual dividend of ten per cent (10%) on the par value of all outstanding stock, said First Parties shall be paid an additional salary annually by way of bonus, *204 equal to twenty-five per cent (25%), that is, twelve and a half per cent (12 1/2%) each, of the remaining net earnings, if any, of said corporation; and "(c) That they will not, either as directors or stockholders, vote to increase the present salaries of Seven Thousand Two Hundred Dollars ($7,200.00) per annum payable by said corporation to each of the First Parties. "This agreement shall be binding upon the heirs, executors, administrators and permitted assigns of the parties hereto." The following is a true and correct schedule showing the income of Hawaiian Freight Association for each of its calendar years commencing with that ended December 31, 1937, including the capital employed and the drawing of the partners as "salary": 3 months
1937
1938
1939
1940
Gross Receipts
$246,797.08
$250,565.69
$275,061.88
$92,623.07
Freight Charges
177,614.61
193,708.75
220,808.29
57,605.65
Gross Profit
69,182.47
56,856.94
54,253.59
35,017.42
Miscellaneous
31.46
Dividends
15.92
35.77
40.90
14.23
TOTAL INCOME
69,198.39
56,892.71
54,294.49
35,063.11
Deductions
19,311.20
21,830.14
24,587.99
7,404.57
NET INCOME
$ 49,887.19
$ 35,062.57
$ 29,706.50
$27,658.54
Partners' "Salaries"
8,015.00
9,300.00
11,000.00
Capital at beginning of year
16,984.12
16,984.12
16,984.12
16,984.12
Accumulated earnings
19,208.21
14,138.17
16,943.74
*205 "(That portion of the foregoing stipulation which deals with the earnings of Hawaiian Freight Association for the three months ended March 31, 1940, shall not be regarded as a concession on the part of the respondent that only one partnership was in existence during said period, it being the respondent's position that the elimination of A. G. Schnack as a partner on March 8, 1940, terminated the existing partnership and resulted in the creation of a new partnership on that date. It is agreed that if the respondent's position in this respect is sustained, the earnings for such three months period can be prorated on a daily basis.)" The following schedule shows the capital accounts, salaries, distributable income, and withdrawals by each of the partners of Hawaiian Freight Association for the calendar years 1937 to 1939, inclusive: CAPITAL ACCOUNTS WITHDRAWALS
1937
J. C. Leffel
G. C. Ballentyne
A. G. Schnack
Capital %
49.26
35.82
14.92
Capital Jan. 1
$ 8,366.42
$ 6,083.67
$2,534.03
Salary
4,200.00
3,815.00
Profit
20,547.83
14,941.60
6,223.58
TOTAL
33,114.25
24,840.27
8,757.61
Drawings
15,247.29
11,926.48
3,346.03
Balance December 31
17,866.96
12,913.79
5,411.58
1938
Balance January 1
$17,866.96
$12,913.79
$5,411.58
Salary
4,650.00
4,650.00
Profit
12,558.77
9,132.26
3,803.83
TOTAL
$35,075.73
$26,696.05
$9,215.41
Drawings
20,158.53
15,828.72
3,877.55
Balance December 31
$14,917.20
$10,867.33
$5,337.86
1939
Balance January 1
$14,917.20
$10,867.33
$5,337.86
Salary
5,500.00
5,500.00
Profit
9,121.37
6,632.71
2,762.71
TOTAL
$29,538.57
$23,000.04
$8,100.57
Drawings
12,293.76
11,613.73
2,803.83
Balance December 31
$17,244.81
$11,386.31
$5,296.74
*206 The record discloses the following additional facts: During the years in controversy Ballentyne was treasurer and a director and stockholder of the petitioner. He was manager of the Honolulu office. His duties there were to make contact with customers on the Islands, to supervise the handling of the freight upon arrival, to make collections and to attend to other necessary business services. He worked a whole day every day of the week and was required to work on Sundays and frequently at night. At the time of the hearing he was 52 years of age. During the same period Leffel was president and a director and stockholder of the petitioner. He was manager of the Chicago office and his duties were to assemble into carload lots all freight delivered in Chicago and originating at Eastern points and to supervise its movement from Chicago to San Francisco, where it was turned over to the Matson steamers for transportation to Honolulu. He also solicited freight to be shipped in the petitioner's care. He worked long hours each day and on Sundays. He was 59 years of age at the time of the hearing. In about 1926 Ballentyne became head purchasing agent of the Hawaiian Pineapple Company and *207 served in that capacity for seven years. He received a salary of $500 per month. In 1933 he became manager of the Hawaiian Freight Forwarders, a corporation organized in that year. In 1936 he became manager of the Honolulu office of the Hawaiian Freight Association, a position which he occupied until he became an officer of the petitioner in 1940. Leffel had approximately 15 years' experience with various transportation companies, including the Universal Carloading and Distributing Company, the largest concern of its kind in the world, whose San Francisco office he managed at a salary of $600 per month. During that service he found that export traffic moving to Hawaii was being handled in a very inefficient manner. He was conversant with freight rates, the knowledge of which is very essential to obtaining shipments. Through his efforts the petitioner effected savings for its customers by shipping by the carload, whereas the shipper normally would be charged at the higher less than carload (LCL) rate. The petitioner had at least eight competitors during 1940 and 1941. At the time of its organization no competitor maintained an office in the Hawaiian Islands. The petitioner promptly *208 established its office in Honolulu and fixed definite rates for its services. The rates were higher than those of its competitors, who were acting merely as freight brokers. Through the personal attention which Ballentyne and Leffel gave to the shippers and receivers of freight, the petitioner commanded and received the higher rate. The petitioner's services included expediting freight shipments through Chicago, routing shipments, inspecting their loading and packaging, handling consignments at Honolulu, arranging for deliveries, checking rates and charges, handling claims, making contact with Eastern suppliers to ascertain when shipments would be ready for movement, and doing many other such favors for its customers. Its services were completed upon the delivery of the shipment to the customer at destination. It is very difficult to obtain men who are experienced and have knowledge of the type of operation conducted by the petitioner. The petitioner handled about 75 per cent of the total freight traffic to the Hawaiian Islands and much more than the Universal Carloading and Distributing Company, its closest competitor. The bonuses of $10,248.21 and $27,251.79 accrued on the petitioner's *209 books (and paid in February of the following year) to each of its two principal officers, Ballentyne and Leffel, for the taxable year ending November 30, 1940, and the fiscal year ending November 30, 1941, respectively, together with their regular salaries, were proper and reasonable compensation for the services performed for the petitioner by such officers. Prior to the execution of the contract of July 12, 1940, Oahu desired to have a connection with the petitioner, since Oahu was in the trucking business and was anxious to have access to incoming freight at the Port of Honolulu. A working capital fund of approximately $30,000 was required to cover the freight and trucking charges advanced by the petitioner for the benefit of its customers and repaid in Honolulu upon delivery of the goods. The petitioner's gross receipts, salary and bonus payments to its two principal officers and taxable net income for the two years here in dispute were reported by it as follows: November
November
30, 1940
30, 1941
Gross Receipts
$240,507.57
$588,435.91
Salary, J. C. Leffel
4,800.00
7,200.00
Salary, G. C. Ballentyne
4,800.00
7,200.00
Bonus, J. C. Leffel
10,248.21
27,251.79
Bonus, G. C. Ballentyne
10,248.21
27,251.79
Net income after salaries
and bonuses, before in-
come tax
2,018.97
7,672.49
*210 The respondent disallowed the bonus accruals to Ballentyne and Leffel in the taxable period ending November 30, 1940, with the following explanation: "* * * It is held that the so-called bonus is in fact a payment by you for property transferred to you by the said G. C. Ballentyne and J. C. Leffel, and that the amount is therefore a capital expenditure and, as such, not a deductible expense of the taxable year. It is further held, even if the amount should be determined to be in fact a payment for services rendered, that the said payment was in excess of a reasonable compensation for the services rendered. The whole amount of the deduction for bonus is therefore disallowed." He disallowed similar amounts accrued in the fiscal year ending November 30, 1941, on the ground that they did "not constitute an allowable deduction as claimed by" the petitioner. The failure of the petitioner to file a timely excess profits tax return for the period from April 1, 1940, to November 30, 1940, was due to reasonable cause (less than $5,000 net income) and not to wilful neglect and hence the petitioner is not liable for the 25 per cent penalty for such failure imposed by the respondent. *211 Opinion VAN FOSSAN, Judge: The fundamental issue before us is whether or not the bonus accrued to each officer of the petitioner on its books for the taxable period under review, together with the regular salaries, constituted reasonable compensation for his services to the petitioner during such periods. In his notice of deficiency the respondent took the ground that the bonus payments (accrued in the taxable years) were made in effect as a part payment of the cost of the petitioner's stock sold by Ballentyne and Leffel to Oahu. He has now abandoned this theory and asserts that they were equivalent to the distribution of earnings to stockholders. The real controversy in the cases at bar, as we see it, is whether or not the amounts paid to Ballentyne and Leffel were "reasonable". We conclude that they were. The terms of the agreement served to inspire Ballentyne and Leffel to extraordinary effort. The record shows that they were very efficient and each officer devoted long hours to the various phases of the business for which he was responsible. Each had the aptitude, the skill, the knowledge, the training and the capacity for hard and sustained effort that were essential to *212 the petitioner's success and the consequent growth in its receipts and profits. We observe the marked increase in gross receipts over the previous years during which the partnership operated. In view of the unique type of the petitioner's activity of its dependence on the specialized training and experience of its officers for the operation and success of the enterprise, of the precise and predetermined amount of the bonus and of the demonstrated skill and efficiency of Ballentyne and Leffel, the amounts of the bonus accrued to those officers in the taxable years, together with the regular salaries, are held to be reasonable compensation for their services as such. In view of our decision on the primary issue, it is unnecessary to discuss or decide the alternative issue. Further, there was no necessity to file an excess profits tax return since the petitioner's income was less than the $5,000 specific exemption. Hence, no penalty attaches to the failure of the petitioner to file a timely return. Decision will be entered under Rule 50.